## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMY WELLS, | |
| Plaintiff, | |
| v. | Civil Action No. 2019-cv-00400 |
| STERALOIDS, INC.; TREVOR ARENDS; SIRI ARENDS GRAHAM; SUSAN TOUCHE ARENDS, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

### Introduction

Plaintiff Amy Wells ("Plaintiff"), by and through her undersigned counsel, hereby brings this complaint against Steraloids, Inc. ("Steraloids"), its Owner and President Trevor Arends ("Mr. Arends"), its owner Susan Touche Arends ("Ms. Arends"), and Mr. and Ms. Ardens' daughter and Steraloids' Human Resources Manager Siri Ardends Graham ("Ms. Graham," collectively "Defendants") based upon their knowing, willful and intentional failure to pay Plaintiff wages to which she is entitled and subsequent termination of Plaintiff after she sought information concerning her entitlement to overtime wages and discussed their right to overtime wages with several coworkers.  Plaintiff seeks payment of compensatory damages, back wages, punitive damages, liquidated damages, and attorneys' fees and costs based upon the Defendants' unlawful withholding of her overtime wages and their retaliatory and unlawful termination of Plaintiff.  In support of this complaint, Plaintiff avers as follows:

### Parties

1.      Plaintiff is an individual who resides at 10 Hall Avenue, Newport, RI

02840.

2.      Steraloids is a corporation organized under the laws of the State of Rhode Island with a principal address of 547 Thames Street, Newport, RI 02840.

3.      Mr. Arends is an individual and citizen of Rhode Island who resides at 30 Castle Hill Avenue, Newport, RI 02840.

4.      Ms. Arends is an individual and citizen of Rhode Island who resides at 30 Castle Hill Avenue, Newport, RI 02840.

5.      Ms. Graham is an individual and citizen of Rhode Island who, upon information and belief, resides at 30 Castle Hill Avenue, Newport, RI 02840.

### Jurisdiction and Venue

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367, and 29 U.S.C. § 216(b).

7.      Venue is appropriate because the complained-of conduct occurred here.

### Facts

8.      On February 15, 2016, Defendants hired Plaintiff to work as a Certified Nursing Assistant caring for Ms. Arends at Mr. and Ms. Arends' home at 30 Castle Hill Avenue, Newport, RI 02840 (the "Arends' Home").

9.      From that date through April of 2019, Plaintiff worked between 78 and 105 hours per week (usually 90 or more) and received her single rate of pay—between $25 per hour and $28.50 per hour—for every hour worked, including all hours above 40 per week.

10.     Plaintiff's wages were issued by check drawn on a payroll account in the name of Steraloids.

11.     While most of Plaintiff's shifts were "overnight" shifts, at no time did

Plaintiff reside at the Arends' Home, either permanently or for an extended period of time.

12.     Plaintiff did not live or sleep at the Arends' Home.

13.     At all relevant times, Plaintiff slept at and resided at her own home, for which she pays rent, with her minor child.

14.     Ms. Arends needed around the clock care and often required medical care in the middle of the night.

15.     Ms. Arends often needed assistance going to the restroom at night and was under constant surveillance overnight due to frequent seizures she suffered.

16.     At no time did Plaintiff provide the Defendants with companionship services.

17.     To the contrary, Plaintiff is a Certified Nursing Assistant and the majority of her job duties required providing "medically related services" and "care" including dispensing medications, arranging medical care, dressing, grooming, feeding, bathing, toileting, and transferring Ms. Arends.

18.     At all relevant times, Plaintiff's performance was excellent and she grew a very close relationship with the Arends family which frequently complimented Plaintiff's work.

19.     In fact, in October of 2018, Ms. Graham wrote a letter on Plaintiff's behalf attesting to the fact that Plaintiff is "competent, caring and reliable" and that Defendants "would be completely lost without her."

20.     In the letter, Ms. Graham also attested to the fact that Plaintiff's primary job duty was providing "care" related to Ms. Arends' various medical issues and that Plaintiff "works over 90 hours a week . . . ."

21.      In April of 2019, Ms. Graham disclosed to Plaintiff that Defendants had

failed to pay her overtime wages to which she was entitled.

22.     On April 12, 2019, Plaintiff met with Ms. Graham and Ms. Graham handed her a check purporting to cover all owed overtime wages for the prior two years in the amount of $21,648.

23.     Upon information and belief, Ms. Arends or an account under Ms. Arends' control or ownership was the source of these funds.

24.     This amount represented the gross pre-tax wages to which Defendants believed Plaintiff was entitled and Ms. Graham told Plaintiff she would be responsible for any taxes owed.

25.     As a condition to receiving wages to which Plaintiff was entitled, Ms. Graham required Plaintiff to sign a "Financial Agreement" stating that the owed wages have "now been paid in full."

26.     Plaintiff did not believe this calculation was accurate given how many hours she had worked and considering the fact that she believed the Defendants' failure to pay wages was willful and therefore Plaintiff was entitled to three years' worth of overtime wages.

27.     On April 17, 2019, Plaintiff text messaged Ms. Graham asking if she could "rescind" her signature until she received "paperwork" as to how Ms. Graham arrived at "that number" because Plaintiff was "puzzled" as to the amount calculated.

28.     Ms. Graham told her she could not since it was "not a contract" and merely a "receipt" stipulating "what the check was for."  She also offered to supply Plaintiff with a spreadsheet showing how the amount was calculated.

29.     Minutes after this brief exchange, Mr. Arends text messaged Plaintiff the following:

Amy, you blindly challenging the generous work Siri has done diligently to rectify the overtime creep that we had . . . does cause me anxiety and causes me to rethink spending time at home while you are there. You are welcome to ask for the workings, but the way you have approached this windfall is not a favorable reflection of character.

30.     Moments later, Ms. Graham text messaged Plaintiff the following:

I spoke to my dad. I'm not sure if he called you. He felt the wording of your text was threatening and thought you were considering some kind of legal action which made him anxious. He didn't say uncomfortable and didn't mean to make you feel your workplace was no [sic] welcoming at all. He felt anxious you were not happy with the overtime payment and were considering legal action which would be a financial and emotional drain on him and our family. He meant it as a way to be more positive and productive moving forward. I will email you the spreadsheets when I finalize them, I'm out of the office until 2.

31.     Ms. Graham subsequently sent Plaintiff a spreadsheet that purports to show the manner in which the owed wages were calculated.  It does no such thing.

32.     The spreadsheet only takes into consideration the prior two years' worth of work and, for reasons wholly unknown, marks multiple weeks as "exempt" without explanation.

33.     Plaintiff estimated that she was actually owed between $75,000 and $110,000 in gross overtime wages for the past two or three years.

34.     Between April 17, 2019 and June 8, 2019, Plaintiff continued seeking further information regarding the manner in which her overtime wages were calculated but received no further explanation beyond the ambiguous and vague spreadsheet.

35.     During that time, Plaintiff also discussed with her co-workers as to what amounts they had received and whether any of them also believed the amounts were incorrect.

36.     Plaintiff disclosed to these coworkers that she believed the amount she

was paid was well below what was owed and that she did not know how to go about getting paid the full amount of her wages.

37.     Given her close relationship with the family, Plaintiff was hurt that Defendants had refused to pay her wages that were owed.

38.     In addition, during this time, Mr. Arends and Ms. Graham began treating Plaintiff with hostility.

39.     Mr. Arends avoided Plaintiff and, when forced to interact with her, he treated her dismissively.

40.     Plaintiff spoke with some co-workers about her treatment and that she was hurt that they were retaliating against her solely because she was inquiring about the manner in which her overtime wages were calculated and that she believed she was entitled to additional wages under state and federal law.

41.     On June 8, 2019, Plaintiff hurt herself at work and was taken to the hospital by ambulance.

42.     After she was diagnosed, Plaintiff advised Defendants that she would be unable to work for three weeks but would then return.

43.     On June 25, 2019, Defendants emailed a termination letter to Plaintiff.

44.     In the termination letter, Defendants stated that Plaintiff was being terminated due to her "continued inappropriate and unprofessional behavior" including "excessive derogatory remarks and threats made on your part regarding the family."

45.     Ms. Graham also text messaged Plaintiff referencing the fact she had emailed the termination letter and that Plaintiff was being terminated because it had been "brought to our attention that there had been serious professional misconduct on your part" and

that after "an investigation into the matter, we no longer feel comfortable continuing a working relationship with you . . . ."

46.    Plaintiff asked what she was being accused of and Ms. Graham responded that she had "multiple accounts of you using derogatory and threatening language in regards to members of the family dating back a while. I was only informed recently and have been investigating the allegations."

47.    Plaintiff denied these allegations and inquired why, if Ms. Graham had been investigating the matter, she was not asked about these allegations prior to being terminated.

48.    Ms. Graham failed to respond to this question.

49.    The sole actions to which this characterization could possibly apply are Plaintiff's comments, complaints, and conversations regarding her entitlement to overtime wages.

50.    Plaintiff never threatened or disparaged Defendants beyond her issues regarding the failure to pay overtime wages and the retaliation she believed she was receiving for having questioned the amount paid and having discussed the issue with coworkers.

51.    Defendants' refusal to pay wages, including overtime wages, was done willfully and with reckless disregard for the law.

52.    The actions taken by Defendants as detailed herein were intentional, arbitrary, unreasonable, tortious, willful, wanton, reckless, and in bad faith.

53.    As a result of the Defendants' actions as detailed herein, Plaintiff has suffered damages including loss of pay, loss of benefits, emotional distress, and humiliation.

## COUNT I
## (RI Payment of Wages Act – Overtime Wages – R.I. Gen. Laws § 28-14-19.2)

54.     Plaintiff repeats and realleges Paragraphs 1-53 as if set forth in full herein.

55.     Plaintiff is an employee as that term is defined by R.I. Gen. Laws §§ 28-12-1, *et seq.*

56.     Defendants are employers as that term is defined by R.I. Gen. Laws §§ 28-12-1, *et seq.*

57.     Plaintiff routinely worked between seventy-five and one hundred ten hours per week while employed by the Defendants.

58.     Defendant refused to pay Plaintiff one and a half times her hourly rate for all hours performed in excess of forty per week

59.     There is no exemption to the RI Payment of Wages Act applicable to Plaintiff or the Defendants.

60.     As a result of these actions undertaken by the Defendants, as described herein, Plaintiff has suffered and continues to suffer damages.

## COUNT II
## (RI Payment of Wages Act - Retaliation – R.I. Gen. Laws § 28-14-19.3)

61.     Plaintiff repeats and realleges Paragraphs 1-60 as if set forth in full herein.

62.     The Defendants retaliated against and terminated Plaintiff because she asserted, supported, and reported in investigations and claim determinations of the unlawful failure to pay wages.

63.     The failure to pay Plaintiff overtime wages violated state law including R.I. Gen Laws § 28-14-1, *et seq.*

64.     Plaintiff reasonably and in good faith believed the failure to pay overtime wages violated state and/or federal law.

65.     As a result of Defendants' actions, Plaintiff has suffered and continues to suffer damages.

## COUNT III
### (Fair Labor Standards Act – Overtime Wages - 29 U.S.C. § 207(a))

66.     Plaintiffs repeat and reallege Paragraphs 1-65 as if set forth in full herein.

67.     Defendants are employers as that term is defined by the Fair Labor Standards Act.

68.     Plaintiff is an employee as that term is defined by the Fair Labor Standards Act.

69.     Defendants are engaged in interstate commerce.

70.     Specifically, Defendants regularly deal with, purchase, and sell goods moving in interstate commerce and regularly utilize the mails, emails, and other instrumentalities of interstate commerce.

71.     Upon information and belief, Defendants have annual gross revenues of more than $500,000.

72.     While working for Defendants, Plaintiff was regularly engaged in interstate commerce.

73.     Specifically, Plaintiff regularly utilized the telephone, mails, and emails, and otherwise utilized instrumentalities of interstate commerce.

74.     Moreover, pursuant to the United States Department of Labor Wage and Hour Division Fact Sheet # 14, "domestic service workers . . . are normally covered by the [Fair Labor Standards Act]."

75.     Plaintiff routinely worked over forty hours per week without receipt of one and a half times her hourly wage.

76.     There is no exemption to the Fair Labor Standards Act applicable to Plaintiff or the Defendants.

77.     While most of Plaintiff's shifts were "overnight" shifts, at no time did Plaintiff reside at the Arends' Home, either permanently or for an extended period of time.

78.     Plaintiff did not live or sleep at the Arends' Home.

79.     At all relevant times, Plaintiff slept at and resided at her own home, for which she pays rent, with her minor child.

80.     At no time did Plaintiff provide the Defendants with companionship services.

81.     To the contrary, Plaintiff, and all but one of her co-workers, is a Certified Nursing Assistant and the majority of her job duties required providing "medically related services" and "care" including dispensing medications, arranging medical care, dressing, grooming, feeding, bathing, toileting, and transferring Ms. Arends.

82.     Moreover, any applicable Fair Labor Standards Act exemption would not be applicable to or exercisable by Steraloids as a third-party employer or joint employer.

83.     Defendants willfully failed to pay Plaintiff overtime wages to which she was entitled for over three years.

84.     In April of 2019, Defendants willfully miscalculated the amount of wages to which Plaintiff was entitled and willfully failed to correct their mistake after Plaintiff raised questions about the manner in which the amount of wages was calculated.

85.     As a result of these violations of law as described herein, Plaintiff has suffered and continues to suffer damages.

**COUNT IV**
**(Fair Labor and Standards Act – Retaliation – 29 U.S.C. § 215(a)(3)**

86.     Plaintiff repeats and realleges paragraphs 1-85 as if set forth in full herein.

87.     The Defendants terminated Plaintiff because she filed a complaint or institutied or caused to be instituted any proceeding related to the Fair Labor Standards Act, or was about to testify in any such proceeding, or because she made complaints to Defendants and sought assistance from or agreed to assist co-workers with regard to her and their rights under the Fair Labor Standards Act.

88.     As a result of the Defendants' retaliatory termination, Plaintiff has suffered and continues to suffer damages.

WHEREFORE, Plaintiff prays for judgment against the Defendants including: an award of actual, compensatory, punitive, and liquidated damages in an amount to be set by the jury; attorneys' fees and costs; interest thereon; and such other and further relief as to the Court seems meet and just.

## JURY DEMAND

Plaintiff hereby demands a jury on all claims so triable.

AMY WELLS

By Her Attorney,

ENRIGHT LAW LLC

/s/ Thomas J. Enright
Thomas J. Enright (#7356)
696 Reservoir Avenue
Cranston, RI 02910
(401) 526-2620
(401) 457-7117  FAX
tom@enrightlawoffice.com

DATED:  July 26, 2019

11